**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA,

        v.                                              14-CR-217-A
                                                          **DECISION AND ORDER**

LUCAS SAMUEL LeCLERC,

                Defendant.
_____

This case is before the Court on the Government's objections to Magistrate Judge Schroeder's Report and Recommendation, which recommends granting the Defendant's motion to suppress.  As discussed below, Cattaraugus County Deputy Sheriffs relied on the Defendant's wife's consent to search a barn located on the Defendant's property.  Inside the barn the deputies found a second room—blocked by a glass door that had been spray-painted black, secured by two locks to which the Defendant's wife had no keys, and surrounded by security cameras—which the deputies proceeded to enter, and in which they found an alleged methamphetamine lab.  The Court concludes that the Defendant's wife had neither actual nor apparent authority to consent to the deputies' entry into the second room.  The Court also concludes that the deputies' conduct was sufficiently culpable that "the deterrent effect of suppression [is] substantial and outweigh[s] any harm to the justice system."  *Herring v. United States*, 555 U.S. 135, 147 (2009).  The Court therefore adopts the Report and Recommendation, but as set forth below, the Court expands on and modifies some of the Report and Recommendation's reasoning.  The Court therefore grants the Defendant's motion.

1

**BACKGROUND**

The facts relevant to the Defendant's motion are straightforward and largely undisputed. On August 17, 2014, the Defendant's wife, Erica LeClerc, called Olean General Hospital to report that her husband had threatened to harm himself with a gun. Transcript of Hearing (Tr.) 5:13-18 (Docket 22). Deputy Sheriff James Clendening of the Cattaraugus County Sheriff's Office was dispatched to respond to Mrs. LeClerc's call. Deputy Clendening met with Mrs. LeClerc, as well as her brother, and learned that the Defendant was working at a job site across the street from the Sheriff's Office. Tr. 6:14-7:7. Deputy Clendening then spoke with the Defendant, who told Deputy Clendening that he "was having a bad night the night before[,] that he was thinking about harming himself the night before." Tr. 8:11-13. Based on that conversation, Deputy Clendening took the Defendant into custody for a mental health evaluation pursuant to New York State law. Tr. 8:14-16.

As Deputy Clendening was taking the Defendant to Olean General Hospital, Mrs. LeClerc's brother called the Cattaraugus County Sheriff's Office to ask whether the Sheriff's Office had "checked the barn at 102 South Court Street in Little Valley"—the LeClerc residence—"because there was a meth lab in there." Tr. 9:20-22. Sergeant Rozler then called Mrs. LeClerc regarding her brother's report. Sergeant Rozler testified that he "was somewhat suspect at first to receive a phone call that it was a meth lab there . . . so [he] questioned [Mrs. LeClerc] on why she felt it was a meth lab." Tr. 43:24-44:1. Mrs. LeClerc answered by describing "some of the things that were there as far as the utensils used to make meth" and that "it had been going on for possibly two and a half years." Tr. 44:4-8. Sergeant Rozler explained to Mrs. LeClerc

that "she would have to give [the Sheriff's Office] permission" to search her and the Defendant's residence. Tr. 44:14-16. Sergeant Rozler then asked Mrs. LeClerc "how long she had lived there." Tr. 44:17. Mrs. LeClerc responded that she was married to the Defendant; that she had lived at the residence for six years; that the residence "was her legal address"; and that "she received her mail there." Tr. 44:17-19.

After Deputy Clendening left Olean General Hospital, he returned to the station to meet Sergeant Rozler. Tr. 10:1-3. The deputies retrieved a consent-to-search form and left to meet Mrs. LeClerc at her and the Defendant's residence. Tr. 10:14-16. Outside the residence, Mrs. LeClerc "reaffirmed . . . that she was married [to the Defendant] and that she had lived there for six years." Tr. 45:15-18. *See also* Tr. 11:8-11. Mrs. LeClerc also identified the barn in which she thought the meth lab was located. Tr. 12:1-2. Before entering the barn, the deputies also learned from Mrs. LeClerc that her name was not listed on the deed to the property. Tr. 58: 2-6. The deputies did not question Mrs. LeClerc further. Tr. 12:15. They instead asked her to sign the consent-to-search form they had brought. Tr. 11:16-20. Mrs. LeClerc did so and then took the deputies to the barn, which was located behind a "large . . . grassy area" that, in turn, was located behind the residence. Tr. 31:5-7. The barn was guarded with a surveillance system that, as a Cattaraugus County Sheriff's Investigator later acknowledged, "was designed to keep people out." Tr. 89:22-23.

Mrs. LeClerc informed the deputies that the barn's main door was locked. The deputies asked Mrs. LeClerc whether she had keys to open the barn, but she responded that she did not. Tr. 27:14-17. The deputies, however, "noticed that there was a hayloft door on the second story that was cracked open." 13:25-14:2. The

3

deputies found a ladder near the barn, which they used to reach the hayloft door. Tr. 14:8-13. Once inside the barn's main room—in which they could see "nothing illegal" (Tr. 28:21-22; 47:18-19)—the deputies unlocked the main door and spoke with Mrs. LeClerc. Tr. 14:25-15:2. As Deputy Clendening testified, the deputies told Mrs. LeClerc "that there was another doorway [inside the barn] that appeared to be locked. . . . [I]t was a glass door that appeared to be spray painted black and that [the deputies] could not see in." Deputy Clendening also observed "that there w[ere] TV cameras or TV screens set up with all the pictures of the cameras that were on the outside of the building, what they were showing." Tr. 15:11-16. The record does not show that the deputies questioned Mrs. LeClerc further about the locked door; rather, Mrs. LeClerc simply "stated that there was a meth lab back there." Tr. 15:22. As with the barn's main door, Mrs. LeClerc did not have keys to the second locked door. Tr. 29:14-16; 60:9-10.

      The second locked door was made of double-paned glass—the outer pane of which had been spray-painted black—and contained a peep hole that the deputies "could not look through." Tr. 72:17-24. The deputies "used a small hammer . . . to break the first window pane of glass" (the one that had been spray-painted black) to allow them to see inside the locked room. Tr. 48:16-17. Inside the room, the deputies "were able to see . . . things of a chemical nature in containers, several glass bottles, [a] cook stove, [a] hot iron[,] and other TVs." Tr. 48:19-22. Sergeant Rozler then called Cattaraugus County Sheriff's Investigator Corey Higgins and told Investigator Higgins what the deputies had located. Tr. 48:25-49:1. Investigator Higgins told Sergeant Rozler to "make entry and determine if there was any kind of product or anything in there." Tr. 63:18-20. The deputies then used a crowbar (Tr. 49:9) to break the two

4

locks—one of which was a deadbolt—that secured the door. Tr. 60:13-21. Once inside the second room, Sergeant Rozler conducted a field test of the substance located on the stove. Tr. 49:14-17. The sample tested positive for methamphetamine. Tr. 49:22. That evening, the deputies charged the Defendant with criminal possession of a controlled substance in the seventh degree, in violation of New York Penal Law § 220.03. Tr. 50:1-22. *See also* Gov't Ex. 6 (Information).

The next day, Sergeant Rozler and Cattaraugus County Sheriff's Investigator Tanya Brown appeared before Cattaraugus County Court Judge Ronald D. Ploetz to "obtain[] a search warrant for the rest of the premises." Tr. 51:4. After being placed under oath, Sergeant Rozler described for Judge Ploetz his "observations and the activities that had occurred the preceding evening." Tr. 52:1-4. Judge Ploetz then issued a search warrant authorizing another search of the barn, as well as a search of the LeClerc residence. Tr. 52:25-53:25. *See also* Gov't Ex. 7 (Search warrant with Investigator Brown's application). Based on that warrant, a second search was conducted to "dismantle[] the [alleged] lab" and to "collect any evidence that [was] not dangerous, such as paperwork[] [and] finished product." Tr. 93:16-21.

The Defendant was ultimately charged in this Court with (1) manufacturing 50 grams or more of a mixture and substance containing methamphetamine (in violation of 21 U.S.C. § 841(a) and 841(b)(1)(B)) and (2) maintaining a premises for the purpose of manufacturing methamphetamine (in violation of 21 U.S.C. § 856(a)(1)). *See* Docket 7. The Defendant moved to suppress evidence obtained from the deputies' warrantless search of the barn, as well as evidence seized based on the August 18th warrant. *See* Docket 13.

As noted, Magistrate Judge Schroeder filed a Report and Recommendation which recommends granting the Defendant's motion. The Government filed objections (Docket 35), which the Defendant responded to. Docket 38. The Government replied (Docket 40), and the Court heard oral argument on April 13, 2014. The Court's review is de novo. *See* 28 U.S.C. § 636(b)(1).

## DISCUSSION

It is well-settled that the Government may justify a warrantless search by "show[ing] that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises . . . sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). The Government, whose burden it is to demonstrate consent, *see United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006), may show that a third-party's consent is valid—and, thus, that the resulting search is lawful—in one of two ways: first, by showing that Mrs. LeClerc had actual authority to consent to the search, *see Matlock*, 415 U.S. at 171 n.7; or second, by showing that Mrs. LeClerc had apparent authority to consent to the search, *see Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). The Court discusses each type of consent in turn.

### A. Whether Mrs. LeClerc had actual authority to consent to the search

In its objections to Magistrate Judge Schroeder's Report and Recommendation, the Government appears to have abandoned its argument that Mrs. LeClerc had actual authority to consent to the deputies' search of the barn. The Court therefore only briefly discusses this portion of the Report and Recommendation, which, as the Government tacitly concedes, is clearly correct.

A third-party has actual authority to consent to a search when she has "both access to and some measure of control (or right to exert control) over the area" to be searched. *Moore v. Andreno*, 505 F.3d 203, 210 (2d Cir. 2007) (citing *United States v. Davis*, 967 F.2d 84, 86-87 (2d Cir. 1992)) (emphases omitted). Although the Second Circuit has not "delimited the requisite 'access' necessary" to find actual authority, *id.* at 210, the court has identified several factors that help resolve this case. First, and most fundamentally, whether a third-party has actual authority "depends on the understandings communicated by the titular owner to [the third party]." *United States v. McGee*, 564 F.3d 136, 140 (2d Cir. 2009). Second, another fact that "can provide important clues as to whether the titular owner has authorized access by the third person" (but which "does not directly answer" the question) is "[t]he presence or absence of locks on doors." *Id.* at 141.

With these factors in mind, it is clear that Mrs. LeClerc did not have "access" to the barn. As noted, the barn door was locked. The Second Circuit has suggested that a fact such as this can be interpreted in one of two ways: First, the lock could have been an indication from the Defendant to Mrs. LeClerc that the barn (and, necessarily, the room inside the barn) was "his private place which she was never to enter." *Id.* Second, the lock could have been an indication from the Defendant that he wanted "only to keep out others, and that [Mrs. LeClerc] was welcome to enter . . . at will, needing only to ask [the Defendant] for the key." *Id.* at 141. Testimony from Mrs. LeClerc conclusively establishes that the former interpretation is correct:

> Q: To your knowledge, was the barn always kept locked?
> A: Yes.
> Q: Do you feel you had access to the barn at all?

7

>A: No.
>
>\*   \*   \*
>
>Q: Were you allowed to go into the barns?
>
>A: Not without [the Defendant's] permission.
>
>Q: Did you—did you consider it his area of the residence?
>
>A: Yes.
>
>\*   \*   \*
>
>Q: And now that you're aware that there are multiple rooms in the barn, did you have any access to any of those rooms?
>
>A: Not on my own, no.
>
>Q: Did you have keys to any of those rooms?
>
>A: No.
>
>Q: Is there any way you could get into the barn without [the Defendant] being there?
>
>A: No.

Tr. 98:9-99:6.  Mrs. LeClerc's testimony on this point could not be any clearer: The Defendant and Mrs. LeClerc had an "understanding[]" that the barn (which necessarily included the locked room inside the barn) "was his private place which she was never to enter."  *Id.*  The fact that Mrs. LeClerc did not have a key to the barn underscores this common understanding.  Mrs. LeClerc therefore lacked "access" to the barn.  She consequently did not have actual authority to consent to the deputies' search.

    **B. Whether Mrs. LeClerc had apparent authority to consent to the search**

Even if Mrs. LeClerc did not have actual authority to consent to the deputies' search of the barn, the Government may nonetheless prove that the search was lawful by showing that Mrs. LeClerc had apparent authority to consent to the search.  This question is an objective one: "would the facts available to the officer *at the moment* warrant a man of reasonable caution in the belief that the consenting party had authority

8

over the premises?" *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (emphasis added). Thus, unlike actual authority, "[f]acts that came to light after the search began cannot reasonably have influenced the officers' beliefs regarding whether [the third-party] possessed apparent authority."[1]  *United States v. Groves*, 470 F.3d 311, 319 (2d Cir. 2006).

Thus, the issue in this case is whether, based on the facts known to them at the time, the deputies could have reasonably (but mistakenly) believed that Mrs. LeClerc had authority to consent to a search of the barn.  To meet its burden of showing that the deputies were reasonably mistaken in thinking that Mrs. LeClerc could provide consent, the Government relies almost entirely on the fact that consent was given by the Defendant's spouse, and not by some other third-party such as a roommate.  In the Government's view, the reasonableness of the deputies' mistaken belief "depends on 'widely shared social expectations' bearing on the relationship between the defendant and the third-party consenter."  Gov't's Objections at 8 (citing *Georgia v. Randolph*, 547 U.S. 103, 111 (2006)).  Specifically, the Government argues that Magistrate Judge Schroeder did not "address or analyze the significance" of the fact that the third-party consenter in this case was the Defendant's wife.  *Id.* at 10.

The Second Circuit has suggested that marriage and shared ownership of property are important factors to consider in assessing whether a third-party has authority to consent to a search.  *See Moore v. Andreno*, 505 F.3d 203, 211 (2d Cir. 2007) (in a § 1983 action, concluding that the plaintiff's "on-again, off-again lover[]" had

---

[1] For this reason, Mrs. LeClerc's testimony at the suppression hearing is almost entirely irrelevant to the Court's analysis of whether she had apparent authority to consent to the deputies' search.  For the same reason, the Court does not consider Mrs. LeClerc's statement to Investigator Brown (Gov't Ex. 8), which Mrs. LeClerc signed the day after the deputies' search.

9

no actual authority to consent to a search of the plaintiff's study because the third party and the plaintiff "were not married and did not share ownership of the house").  But the Second Circuit does not appear to have directly answered the question posed by this case: whether a defendant's spouse has presumptive authority to consent to a search of all marital property.[2]  The Seventh Circuit, however, in a case cited with approval by the Second Circuit, has addressed the issue in detail.  *See United States v. Duran*, 957 F.2d 499 (7th Cir. 1992); *Moore*, 505 F.3d at 211 (citing *Duran*).

In *United States v. Duran*, the Seventh Circuit considered a case in which the defendant's wife, after "admit[ing] that [the defendant] sold large quantities of marijuana, . . . signed a form consenting to a search of [her and her husband's] residence, as well as several outbuildings and an old farmhouse on the property."  957 F.2d at 501.  After the police found firearms and marijuana in the farmhouse, the defendant moved to suppress evidence from the search, contending that his wife had neither actual nor apparent authority to provide consent to search the farmhouse.  The Seventh Circuit began by noting that, "[a]s a general matter, one spouse has the authority to consent to a search of a premises *jointly occupied* by both spouses."  *Id.* at 503 (emphasis added).  But the Seventh Circuit then identified "a subtle twist on the general rule—the key . . . is the limiting term 'jointly occupied.'"  *Id.* at 504.  The defendant in *Duran*, the court noted, did not challenge the search of his and his wife's joint residence; rather, he challenged the search of the farmhouse "to which, he claims, [his wife] had no joint access or

---

[2]  Authority to consent to a search "is, of course, not to be implied from the mere property interest a third party has in the property.  The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements but rests rather on mutual use of the property by persons generally having joint access or control for most purposes."  *Matlock*, 415 U.S. at 171 n.7.  Thus, the Court does not use the term "marital property" in the same sense that it might be used in State domestic relations law or property law.  Instead, the term is merely used as shorthand to refer, in this case, to the LeClerc residence, as well as the three nearby barns.

10

control and hence no authority." *Id.* The defendant supported this argument by "observ[ing] that [his wife] believed that the farmhouse was [his] private gym, that she never went into or used the structure, and that the police did not find any of her clothing or personal effects there." *Id.* Based on the third-party consent doctrine's rationale of assumed risk, *see Matlock*, 415 U.S. at 171 n.7, the Seventh Circuit rejected a per se rule that one spouse may consent to a search of all marital property. Such a rule would be incorrect, the court held, because it "presumes that spouses, in forging a marital bond, remove any and all boundaries between them—in other words, that spouses surrender all privacy or other individual interests with respect to one another." *Id.* at 504. The court rejected this assumption, noting that "[n]ot all spouses share everything with their mates" and, therefore, that not all spouses "surrender every quantum of privacy or individuality with respect to one another." *Id.*

The court therefore left "open the possibility that one spouse may maintain exclusive control over certain portions of the family homestead." *Id.* Applying this "possibility" to third-party consent doctrine, the Seventh Circuit held that "a spouse presumptively has authority to consent to a search of all areas of the homestead; the nonconsenting spouse may rebut this presumption only by showing that the consenting spouse was denied access to the particular area searched." *Id.* at 505. Turning to the facts of *Duran*, the Seventh Circuit concluded that, while the defendant's wife did not use the farmhouse, she "was not denied access to the old farmhouse, but rather made it a habit not to enter the building." *Id.* at 505. The court therefore held that the defendant's wife had actual authority to consent to a search of the farmhouse. *Id.*

11

Applying *Duran* to the facts of this case, Mrs. LeClerc could presumptively consent to a search of all marital property, but the Defendant could then show that the deputies knew or "had reason to know" that certain areas of that property—namely, the barn in which the alleged meth lab was found—were not jointly-occupied and were, instead, "off-limits" to Mrs. LeClerc. *United States v. Almeida-Perez*, 549 F.3d 1162, 1172 (8th Cir. 2008) (calling this know-or-should-have-known interpretation of *Duran* "more accurate"). *See also* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.4(a) at 263-64 (5th ed. 2012) (discussing *Duran* and noting that "*in the absence of some information in the hands of the police indicating exclusive use*, such as that the wife does not have a key to the particular area to be searched, under the apparent authority rule, it may be said that if the property is of the kind over which the wife normally exercises as much control as the husband the police may quite properly assume that the wife has authority to consent to the search of that property") (emphasis added) (citations omitted).

Before applying the law discussed above to the facts of this case, however, it is helpful to separate the deputies' search into two parts: their initial entry into the barn, and their further entry into the second locked room. Third-party consent may, but does not necessarily, extend to all rooms in a building; whether it does depends on "the officer's reasonable belief as to the extent of the consent." *United States v. Davis*, 967 F.2d 84, 88 (2d Cir. 1992) (citing *Florida v. Jimeno*, 500 U.S. 248 (1991)). *See also Almeida-Perez*, 549 F.3d at 1172 ("Where a third party appears to have authority over the entire premises, the police may rely on that person's consent to search throughout the house, so long as the consent appeared to extend that far."); *cf. United States v.*

*Zapata-Tamallo*, 833 F.2d 25, 27 (2d Cir. 1987) (observing that "a third party's consent to a search is generally invalid when it is obvious that the searched item belongs to a guest") (citations omitted). That is, whether the deputies in this case knew or should have known that an area was "off-limits" to Mrs. LeClerc—and, thus, not within the scope of her apparent authority—could change as the deputies' search continued and revealed additional facts that were unavailable at the time when the deputies first obtained consent.

The record indicates that the deputies did not locate any incriminating evidence when they first entered the barn. *See* Tr. 28:21-24; *id.* 48:7-10. As a result, to resolve the Defendant's motion, the Court need not address whether Mrs. LeClerc had apparent authority to consent to the deputies' initial entry into the barn.[3] By the time the deputies entered the barn and encountered the locked door, however, the facts then available to the deputies should have put them on notice that Mrs. LeClerc's authority to consent—if it even extended to the barn—had clearly run out. By that point of the search, the deputies had encountered a room that was unquestionably meant to be private. The

---

[3] It bears noting, however, that Sergeant Rozler entered the barn unsure of whether Mrs. LeClerc had authority to consent to the deputies' initial entry. Sergeant Rozler testified that, after learning that Mrs. LeClerc was not on the deed to the property, he questioned "whether or not she would be able to give [him] permission to search it." Tr. 58:4-11. Whether Mrs. LeClerc was listed on the deed is irrelevant for purposes of whether she had actual authority to consent to the search. *See Matlock*, 415 U.S. at 171 n.7 ("Common authority is, of course, not to be implied from the mere property interest a third part has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements but rests rather on mutual use of the property by persons generally having joint access or control for most purposes.") (citations omitted). However, whether this fact matters for purposes of Mrs. LeClerc's *apparent* authority is not as clear. If Sergeant Rozler was under the impression that Mrs. LeClerc had to be listed on the deed to give consent, his belief might be characterized as a mistake of law, rather than a mistake of fact. The Second Circuit has held that the "apparent authority rule applies only to mistakes of fact and not mistakes of law." *Moore*, 505 F.3d at 209 (brackets and quotation marks omitted) (quoting LaFave, *Search and Seizure*, § 8.3(f) at 175 (4th ed. 2004)). But it is unclear whether or to what extent this rule remains valid after the Supreme Court's decision in *Heien v. North Carolina*, 135 S. Ct. 530 (2014). The Court need not resolve this issue, however, because, as discussed below, the deputies encountered additional red flags during their search, which provide a sufficient basis to conclude that they should have known that Mrs. LeClerc's apparent authority (if it even existed) had run out.

glass door blocking entry into the room was spray-painted black, strongly suggesting that the person who used the room had taken affirmative steps to keep others from seeing the contents of the room. The door was secured with multiple locks (including a deadbolt), none of which the Defendant's wife had a key to. Tr. 60:6-21. The door also contained a peephole, allowing the room's occupant to see out, but which the deputies "could not look through." Tr. 72:12-73. And the room was surrounded by a "sophisticated camera system" (Tr. 32-33) that showed "pictures [from] the cameras that were on the outside of the building." Tr. 15:14-16. The fact that the Defendant's wife did not have a key to enter the locked room is, of course, not dispositive of the question whether the deputies should have known that the locked room was clearly "off-limits" to Mrs. LeClerc. *See United States v. McGee*, 564 F.3d 136, 141 (2d Cir. 2009). But a locked door to which Mrs. LeClerc had no key, combined with the other facts described above, shows that the deputies knew or should have known that "[t]he objective of the locked door . . . was to keep" Mrs. LeClerc (among others) "out of the premises she had invited the police to search." *Id.* Put differently, by that point in the search, the deputies should have known that they had encountered an area meant to be "off-limits" to Mrs. LeClerc, and that her authority to consent had run out. *Almeida-Perez*, 549 F.3d at 1172. *See Moore*, 505 F.3d at 212-13 ("As Chief Justice Roberts has explained, *at a bare minimum*, 'a person [who] wants to ensure that his possessions will be subject to a consent search only due to his own consent [may] place these items in an area over which others do not share access and control, [like] *a private room*.'") (quoting *Randolph*, 547 U.S. at 135 (Roberts, C.J., dissenting)) (ellipses omitted, brackets and second emphasis added in *Moore*).

Mrs. LeClerc therefore lacked apparent authority to consent to the warrantless search of the locked room in which the alleged meth lab was found. As a result, the deputies' entry into the room, and their subsequent search of the room, violated the Fourth Amendment.

### C.  Whether suppression is appropriate

That the deputies' search violated the Fourth Amendment does not, of course, automatically result in suppression. "The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands." *United States v. Leon*, 468 U.S. 897, 906 (1984). The exclusionary rule is, therefore, a "judicially created rule" that "is designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Herring v. United States*, 555 U.S. 135, 139-40 (2009) (citations omitted). As a result, exclusion is not "a necessary consequence of a Fourth Amendment violation." *Id.* at 141. Rather, "[t]he animating principle of the exclusionary rule is deterrence of police misconduct, but the extent to which the rule is so justified 'varies with the culpability of the law enforcement conduct.'" *United States v. Clark*, 638 F.3d 89, 99 (2d Cir. 2011) (quoting *Herring*, 555 U.S. at 155 and *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). Specifically, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. Thus, the Supreme Court has found that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* In this case, the Court must therefore determine whether the deputies were acting in "good faith" by answering the

"'objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all the circumstances.'" *Id.* at 145 (quoting *Leon*, 468 U.S. at 922 n.23). The Government carries the burden of demonstrating "the objective reasonableness of the officers' good faith" conduct. *Clark*, 638 F.3d at 100.[4]

To meet its burden of showing that the deputies acted in good faith, the Government argues that the deputies did not know, and could not have known, that their conduct violated the Fourth Amendment because "[t]hey questioned the [Defendant's] wife in detail as to her relationship to the defendant, her use of their marital home, and her knowledge of the contents of the barn in her own backyard." Gov't's Objections at 11-12. The Government goes on to argue that "[t]he information obtained by the deputies through such good-faith diligence justified their reliance on her purported authority to consent to their entry." *Id.* at 12. As an initial matter, the record simply does not support the Government's contention that the deputies questioned Mrs. LeClerc "in detail." Instead, the record shows only that the deputies learned several facts that, for purposes of whether Mrs. LeClerc could consent to a search of the barn, are fairly unremarkable: (1) that she "lived [at] and owned th[e] property" where the Defendant and his wife's residence was located (Tr. 13:12-14); (2) that the address was "[Mrs. LeClerc's] legal address and [that] she received her mail there" (Tr. 44:20-21); (3)

---

[4] *Clark* states that the Government bears the burden of showing that officers relied in good faith "on an invalidated warrant." *Id.* At least in this Circuit, it is unclear whether the good faith exception applies to cases that do not involve invalidated warrants. *See United States v. Herrera*, 444 F.3d 1238, 1251 (10th Cir. 2006) ("[A]uthority[] from . . . the Supreme Court . . . indicates that *Leon*'s good-faith exception to the exclusionary rule generally applies only narrowly outside the context of a warrant. It has not been applied when the mistake resulting in the Fourth Amendment violation is that of the officer conducting the search and seizure, rather than a neutral third party not engaged in the 'competitive endeavor of ferreting out crime.'") (quoting *Leon*, 468 U.S. at 914). Because neither party raises the issue, the Court assumes for purposes of this decision that the good faith exception applies to cases that do not involve invalidated warrants.

that she had been married to the Defendant for six years (Tr. 11:10-11); and (4) that the barn the deputies searched was the "barn that the meth lab was in" (Tr. 12:1-2). *See also* Tr. 45:13-17 (Sgt. Rozler's testimony that these same basic facts constituted the "additional information" he learned after speaking with Mrs. LeClerc). Because the Government bears the burden of showing that the deputies acted in good faith, these are the facts on which the Court decides whether the deputies' conduct was "sufficiently culpable" to justify suppression. *Herring*, 555 U.S. at 144.

In light of all the information known to the deputies by the time they encountered the locked room inside the barn, the handful of facts described above do not show that the deputies acted in an objectively reasonable manner by entering the locked room. To be sure, the fact that the Defendant's wife (and not some other third party) gave the initial consent is very relevant to whether the deputies acted in good faith; the deputies certainly would have been acting in good faith if they took Mrs. LeClerc's word—with little or no additional questioning—that she could consent to a search of the Defendant's residence and, perhaps, even the barn. But the record does not show that the deputies asked any additional questions after they encountered the locked door inside the barn. Instead, the record shows only that the deputies received Mrs. LeClerc's verification that "there was a meth lab back there." Tr. 15:22. The deputies' failure to reevaluate the validity of Mrs. LeClerc's consent when they encountered the second room is sufficiently culpable that suppression could deter similar conduct. The record strongly suggests that the deputies interpreted Mrs. LeClerc's consent as blanket authorization to search everything in the barn. *See* Tr. 104:17-19 (Testimony of Mrs. LeClerc) (Q: Was [breaking the glass door] within the scope of your permission? A: They just asked if I

had lived at 102 and *they said that was good enough for them* so . . .") (ellipsis in transcript, emphasis added).  Although this assumption might ordinarily be sound (particularly when the consenting third-party is the property-owner's spouse), it loses support when, as here, officers encounter a room that was unquestionably intended to be private.  To be clear, the record does not show (and the Court does not suggest) that the deputies deliberately violated the Defendant's Fourth Amendment rights.  But it was at least "grossly negligent," *Herring*, 555 U.S. at 144, for the deputies to continue their search of the barn after encountering the numerous red flags surrounding the locked room.

Thus, the good-faith exception to the exclusionary rule does not apply in this case.  Suppression is therefore warranted.  The Court recognizes that "exclusion has always been [a] last resort, not [a] first impulse."  *Id.* at 140 (citations omitted).  The Court is also entirely mindful that its conclusion comes at a "cost of . . . letting [an allegedly] guilty . . . defendant[] go free—something that 'offends basic concepts of the criminal justice system.'"  *Id.* at 141 (quoting *Leon*, at 468 U.S. at 908).  But the underlying purpose of the exclusionary rule is "to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."  *Elkins v. United States*, 364 U.S. 206, 217 (1960).  This means that, in appropriate cases, the Court may need to "'exclude[e] evidence obtained against those who . . . are guilty.'"  *Id.* at 218 (quoting *Brinegar v. United States*, 338 U.S. 160, 181 (1949) (Jackson, J., dissenting)).  With these principles in mind, and after careful consideration of the record, the Court agrees with Magistrate Judge Schroeder that this is a case in

which "the deterrent effect of suppression [is] substantial and outweigh[s] any harm to the justice system." *Herring*, 555 U.S. at 147.

As a result, all evidence obtained from the deputies' warrantless search of the locked room on August 17, 2014 is inadmissible against the Defendant. Also inadmissible is "testimony as to matters observed during [the deputies'] unlawful invasion" of the locked room. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). Further, as noted, the day after the search, Sergeant Rozler and Investigator Tanya Brown appeared before Cattaraugus County Court Judge Ronald D. Ploetz to obtain a warrant to search, among other things, the Defendant's barn and residence. As Sergeant Rozler and Investigator Brown both testified, Judge Ploetz authorized a search warrant on the basis of Sergeant Rozler's "observations and . . . activities that had occurred" the day before. Tr. 52:1-4 (Sgt. Rozer); Tr. 82:18-83:15 (Investigator Brown). *See also* Gov't's Ex. 7 (Search warrant and Investigator Brown's application). Thus, as Magistrate Judge Schroeder found, the "material information used for purposes of obtaining the search warrant on August 18, 2014 and upon which Judge Ploetz issued the warrant" was learned as a result of the deputies' Fourth Amendment violation. Docket 34 at 20.

Thus, all evidence seized based on the August 18, 2014 search warrant is also inadmissible. "The exclusionary prohibition extends as well to the indirect as the direct products" of illegal searches. *Wong Sun*, 371 U.S. at 484. Whether evidence obtained as a result of a Fourth Amendment violation is inadmissible "fruit 'of the poisonous tree' . . . depends on 'whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstances

so as to remove the taint imposed upon that evidence by the original illegality.'" *Young v. Conway*, 698 F.3d 69, 77 (2d Cir. 2012) (quoting *Wong Sun*, 371 U.S. at 471). There is no question (nor does the Government even argue) whether evidence seized based on the August 18 search warrant is the immediate and direct byproduct of the deputies' illegal August 17 entry into the locked room. There was no attenuation or interruption between the two events, nor does the record reflect that Sergeant Rozler and Investigator Brown presented any testimony to Judge Ploetz that was *not* based on the August 17 search. Thus, as a result, all evidence seized based on the August 18, 2014 search warrant is inadmissible.

## CONCLUSION

For the reasons stated above, the Court adopts Magistrate Judge Schroeder's Report and Recommendation. Docket 34. The Defendant's motion to suppress (Docket 13) is therefore granted. The parties shall appear for a status conference on May 17, 2016 at 11:00 a.m.

**SO ORDERED.**

Dated: May 13, 2016　　　　　　　　　　　　　　__s/Richard J. Arcara_____
　　Buffalo, New York　　　　　　　　　　　　HONORABLE RICHARD J. ARCARA
　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE